UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITE ROCK INSURANCE (SAC) LTD., <br><br> Petitioner, <br><br> v. <br><br> VESTTOO LTD. and its subsidiaries,[1] <br><br> Respondents. | Civil Action No. |

**VERIFIED PETITION FOR INJUNCTIVE RELIEF
IN AID OF FOREIGN ARBITRATION**

Petitioner White Rock Insurance (SAC) Ltd. ("**White Rock**"), by and through its undersigned counsel Quinn Emanuel Urquhart & Sullivan, LLP, alleges as follows for its Verified Petition.

**NATURE OF THE ACTION**

1.  This is a special proceeding seeking expedited injunctive relief in aid of arbitration, pursuant to Federal Rules of Civil Procedure 64 and 65 and Section 7502(c) of the New York Civil Practice Law and Rules (the "**CPLR**"). White Rock seeks an injunction freezing the assets of Respondents Vesttoo Ltd. and its subsidiaries[2] listed in Exhibit 1 (Vesttoo Ltd. and its subsidiaries, collectively, "**Vesttoo**") pending arbitrations of White Rock's claims against Vesttoo, stemming from an apparent large-scale fraud scheme surrounding letters of credit ("**LOC**") provided by Vesttoo to collateralize reinsurance transactions facilitated by White Rock on behalf of its insurer clients. Although primarily a middle man, with the goal of protecting its clients White Rock is exercising its contractual rights against Vesttoo to recover funds and obtain acceptable security for

---

[1] A list of Vesttoo Ltd.'s subsidiaries is attached hereto as Exhibit 1.
[2] Vesttoo Reinsurance Intermediary Services Inc is licensed by the New York State Department of Financial Services.

the benefit of its clients. Without immediate injunctive relief from this Court, Vesttoo may empty its bank account prior to any adjudication in the forthcoming arbitrations, rendering ineffectual the anticipated relief in the arbitration.

2.      White Rock, an indirect wholly-owned subsidiary of Aon Plc ("**Aon**"), offers reinsurance solutions through the utilization of "cell" or "segregated account" facilities. As a company registered under the Bermuda Segregated Accounts Act 2000, White Rock is empowered by Bermudian law to operate separate cells wherein the assets and liabilities of each "cell" are segregated from each other and from the general assets and liabilities of the company. White Rock uses these cell structures as "transformers" for its clients to access third-party capital through entities like Vesttoo where those parties have already agreed to the general terms of the reinsurance transaction, such as premiums to be paid, terms, etc.[3] White Rock then holds collateral for a particular reinsurance solution in a specific cell and at all times, the financial obligations under the reinsurance contract are limited to the value of the assets in the segregated account.

3.      Vesttoo is an Israeli privately-held startup that purported to facilitate capital market transactions for insurance-linked securities investors, whereby those investors would fund reinsurance obligations via letters of credit. For most transactions at issue, Aon insurance and reinsurance brokers partnered with certain lender clients who wished to consider investments in start-up companies or other firms with significant intellectual property ("**IP**") assets who needed funding to support their growth. Recognizing that the value of IP assets may be fluid, Aon's client lenders would obtain collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and through a segregated account created by White Rock to facilitate reinsurance transactions agreed to between client insurers and Vesttoo. Vesttoo's role was to

---

[3] In accordance with Bermudan regulations, White Rock commits only third-party investor capital to its cells and does not put up any money or bear any risk itself.

contract with investors for investment capital as collateral—in the form of letters of credit ("**LOCs**")—to secure the reinsurance obligations and provide recovery to insurers in the event of default (and subsequent claim under the collateral protection insurance). Accordingly, under this structure, reinsurance coverage for an insurance provider is secured entirely by an ability to draw down on the LOCs presented by Vesttoo.

4. But Vesttoo now admits that, unbeknownst to White Rock or Aon, an unknown number of the LOCs Vesttoo presented to White Rock and its clients were fraudulent. On information and belief, the fraudulent Vesttoo LOCs could total in the billions of dollars.[4] Given the imminent collapse of Vesttoo expected to flow from this discovery, on information and belief, Vesttoo intends to remove all or substantially all funds from its United States bank accounts and dissipate the funds making them near impossible to recover.

5. By presenting fraudulent LOCs to White Rock and its clients, Vesttoo breached its obligations under its agreements with White Rock. Most fundamentally, as discussed in further detail below, Vesttoo breached its obligation to provide White Rock with acceptable security. In addition to immediately providing White Rock with acceptable security, the agreements between the parties mandate that Vesttoo immediately indemnify White Rock and return to it all the distributions paid under the relevant agreements in the event the assets were insufficient to meet obligations.[5]

6. White Rock's agreements with Vesttoo contain an arbitration provision stating that any dispute arising out of or relating to the agreements shall be resolved in binding arbitration in

---

[4] *See, e.g.*, DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023), www.dbrsmorningstar.com/research/417719 (stating that "we estimate the total size of outstanding transactions to be between $5 billion and $10 billion based on the Company's total revenue of approximately $200 million in 2022.").
[5] Exhibit 2, PSA § 5.

Bermuda. White Rock intends imminently to file demands for arbitration against its Vesttoo counterparties in order to enforce its rights under the agreements.[6] But those arbitration proceedings will be futile absent injunctive relief from this Court preventing Vesttoo—a privately held foreign company involved in apparent fraud—from concealing or dissipating its assets.

## THE PARTIES

7. Petitioner White Rock is a Bermuda exempted segregated accounts company registered under the Bermuda Segregated Accounts Company Act of 2000, with its registered office in Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10, Bermuda. White Rock is an indirect wholly-owned subsidiary of Aon Plc, a global professional services firm providing a broad range of risk, health, and wealth solutions.

8. Respondent Vesttoo is a privately-held company registered under the laws of Israel, with registered offices in 510 Madison Avenue, 24th Floor, New York, NY 10022. Vesttoo's subsidiary, Vesttoo Reinsurance Intermediary Services Inc, is licensed by the New York State Department of Financial Services. Many of Vesttoo's directors and employees reside in New York including, but not limited to, Gaurav Wadhwa, Chief Financial Officer; David Schonbrun, Chief Legal Officer; Lauren Smith, Interim Chief Legal Officer; Oran Barkai, VP Global Revenue and Growth; Minas Kalachian, Head of Structuring; Daniel Goldfried, Deputy Chief Legal Officer; and Ron Adiel, VC of US Operations. On information and belief, Vesttoo communicated and facilitated with New York bank branches to obtain letters of credit, including but not limited to China Construction Bank New York Branch, Banco Santander, and Standard Chartered Bank, USA. Upon information and belief, Vesttoo Limited Partners ("**LP**") retain bank accounts in New York in connection with their investments in Vesttoo. Upon information and belief, non-resident

---

[6] White Rock intendeds to pursue its rights in other jurisdiction.

company founders and c-suite executives visited the state in the course of doing business for Vesttoo.

9. Respondent Vesttoo's subsidiaries Vesttoo Bay XIV, LP., Vesttoo Bay XV, LP., Vesttoo Bay XVII, LP., Vesttoo Bay XIX, LP., Vesttoo Bay XX, LP., Vesttoo Bay XXI, LP., Vesttoo Bay XXII, LP., Vesttoo Bay XXIV, LP., Vesttoo Bay XXV, LP., Vesttoo Bay 101, LP., Vesttoo Bay 102, LP., and Vesttoo Partners 103, LP. are privately-held entities registered under the laws of Israel with registered offices in 1 Maharal Street, Tel-Aviv Israel.

10. Respondent Vesttoo's subsidiaries Vesttoo Asset Management LLC, Vesttoo Reinsurance Intermediary Services Inc., Vesttoo RT SPV LLC, Vesttoo SPV Holdings LLC, and Vesttoo US Inc. are privately-held entities registered in the state of Delaware with registered agent Business Filings Incorporated, 108 West 13th St, Wilmington, DE, 19801. Respondent Vesttoo's subsidiary Vesttoo Securities (USA) LLC is also a privately-held entity registered in the state of Delaware with registered agent The Corporation Trust Company, Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

11. Respondent Vesttoo's subsidiary Vesttoo Reinsurance Intermediary Services Inc. is a privately-held entity registered in the State of New York with registered agent The Corporation, 187 Wolf Road, Suite 101, Albany County, Albany, NY 12205.

## JURISDICTION AND VENUE

12. By this Petition, White Rock seeks relief in aid of its forthcoming arbitrations in Bermuda to redress Vesttoo's breaches of its agreements with White Rock, including by presenting fraudulent LOCs.

13. The forthcoming arbitration proceedings are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**") because they will be seated in Bermuda, which has acceded to the New York Convention.

14. The Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. § 202, which provides, in relevant part: "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention" as long as it does not "aris[e] out of such a relationship which is entirely between citizens of the United States." 9 U.S.C. § 202.

15. Furthermore, 9 U.S.C. § 203 provides that: "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203.

16. Here, the underlying arbitrations relate to a legal commercial relationship and the parties are foreign entities. It therefore meets the criteria of 9 U.S.C. §§ 202-203. *See Endurance Specialty Ins. Ltd. v. Horseshoe Re Ltd. on behalf of Separate Accts. HS0083 & HS0084*, No. 23-CV-1831 (JGK), 2023 WL 4346605, at *4 (S.D.N.Y. July 5, 2023) (Bermuda arbitration fell under New York Convention because the parties were "legal parties to two commercial contracts containing…arbitration agreements[.]"); *Kenney, Becker LLP v. Kenney*, 494 F. Supp. 2d 252, 254 (S.D.N.Y. 2007) ("Whether an agreement 'falls under' the [New York] Convention depends on the commercial nature of the parties' relationship—not the specific dispute[.]").

17. Vesttoo was operating out of its New York branch when it procured the fraudulent LOCs. On information and belief, Vesttoo's New York employees were responsible for contacting White Rock concerning the contested LOCs and participated in their procurement.

18. Vesttoo's LPs have active United States bank accounts with Truist Bank. On more than twenty occasions, White Rock wired advances of funds to these accounts at Vesttoo's request, relying on LOCs which have since been identified as fraudulent.

## FACTUAL BACKGROUND

19. This matter arises from Vesttoo's presentation of fraudulent LOCs to White Rock and its clients in violation of Vesttoo's agreements with White Rock.

**Vesttoo Raises $110 Million And Reaches $1 Billion Valuation.**

20. Founded in 2018 by Yaniv Bertele, Ben Zickel and Alon Lifshitz, each of whom owns about 24% of the company's shares,[7] Vesttoo is a privately-held company that purports to use a digital platform for assessing risk in insurance investments, claiming to enable insurance companies to obtain reinsurance coverage at a lower cost from investors through the capital markets. Vesttoo's subsidiary, Vesttoo Reinsurance Intermediary Services Inc., is licensed by the New York State Department of Financial Services.

21. Vesttoo defines itself as a "leading technology-driven global insurance risk transfer platform," claiming it utilizes "AI-powered technology with expertise in data science, insurance, and finance" so that "insurers have the capital they need" and "investors have opportunities to diversify with uncorrelated, low-volatility insurance-linked assets."[8] Vesttoo had raised $110 million from investors since its founding and, in October 2022, it reported that its valuation had reached $1 billion.

---

[7] Meir Orbach, Tomer Ganon, Azar Almog, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* (July 19, 2023) https://www.calcalistech.com/ctechnews/article/rjpbxmhc2.
[8] *Vesttoo Closes $80 Million Series C Financing Round, Increasing Valuation to $1 Billion*, (Oct. 25, 2022) https://vesttoo.com/pr/vesttoo-closes-80-million-series-c-financing-round-increasing-valuation-to-1-billion/.

7

**Vesttoo's Collaboration With Aon And White Rock On Collateral Protection Insurance.**

22.     Near the end of 2021, Aon and its clients began collaborating with Vesttoo in a variety of different transactions, based on Vesttoo's representations and assurances to Aon and its insurer clients regarding its ability to procure acceptable collateral.  This collaboration began with IP owners seeking loans against their IP.  The lenders in those transactions would then seek collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and transformed into reinsurance through a segregated account held by White Rock.  A typical collateral protection insurance transaction chain often took the following form:

- Company contracts with Lender for IP-backed loan;
- Lender, in turn, contracts with Insurance Provider for collateral protection insurance in the event of a default on the loan;
- Insurance Provider and Vesttoo arrange for reinsurance, and negotiate associated terms, using White Rock as a contractual counterparty and transformer which issued the policy and accepted the premium to be paid to Vesttoo; and
- Vesttoo contracts with investors for investment capital; investors provide letters of credit issued by banks as collateral to secure White Rock's obligations with Insurance Provider as beneficiary to the LOC and provides Insurance Provider access to funds in the event of default.

<u>Collateral Protection Insurance Overview</u>



**The Participating Shareholder Agreements Between Vesttoo And White Rock And Their Arbitration Provision.**

23.     In each instance where it issued an reinsurance policy to cedents through these cell arrangements, White Rock entered into a Participating Shareholder Agreement with a Vesttoo

8

entity (such agreements, collectively, the "**PSA**").⁹  Parties to each PSA included White Rock, White Rock acting in respect of one of its segregated accounts, and a unique Vesttoo subsidiary organized for the purpose of that transaction (*see* Exhibit 2).  Under the PSAs, White Rock agreed to make the Vesttoo entity (*i.e.*, the Shareholder) the owner of each segregated account with 100% interest in its proceeds (less losses, expenses, and fees).

24.  Under each PSA, Vesttoo agreed, among other things, to provide "Acceptable Security" to White Rock to secure both an indemnity obligation to White Rock and the liability and collateral requirements set forth in White Rock's reinsurance certificate with the applicable cedent, as negotiated between the insurer and Vesttoo.  As to security, the PSAs state that

> [Vesttoo] agrees to provide Acceptable Security to or for the benefit of the [White Rock] Segregated Account, separately to enable the [White Rock] Segregated Account to meet any and all liabilities and any and all collateral requirements arising pursuant to the terms of the Reinsurance Agreement. [Vesttoo] further agrees to indemnify the [White Rock] Segregated Account in the event the assets of the Segregated Account are insufficient to meet the obligations of the [White Rock] Segregated Account.¹⁰

25.  As to the definition of the term "Acceptable Security," the PSAs provide that

> [Vesttoo] shall provide [White Rock] and/or the [White Rock] Segregated Account with security, in a form acceptable to [White Rock], for [Vesttoo's] obligations, as shall be determined from time to time by the [White Rock] and [Vesttoo] ("Acceptable Security"). [Vesttoo] ***will also provide a Letter of Credit to be issued on behalf of the [White Rock] Segregated Account, for the benefit of the Insured***.¹¹

26.  Next, in Clause 4 of the PSAs, Vesttoo agreed to indemnify White Rock "to the extent the balance of the profits and losses allocated . . . less cumulative dividends paid, are less

---

⁹ A form PSA was used in each instance.  A true and correct copy of a representative executed PSA is attached hereto as Exhibit 2.
¹⁰ Exhibit 2 § 5.  For each reinsurance transaction, White Rock, a Vesttoo subsidiary, and Aon Insurance Managers (Bermuda) Ltd. ("**Aon IMB**") also entered into a Cell Management Agreement, which stated that neither Aon IMB nor White Rock can be held responsible or liable to Vesttoo or any other party for certain failures by Vesttoo to properly perform its obligations.  *See* Form of Cell Management Agreement, § 9.  A true and correct copy of the Form of Cell Management Agreement is attached hereto as Exhibit 3.
¹¹ Exhibit 2, Schedule B (emphasis added).

than zero at any point in time as calculated by [White Rock]." In that event, Vesttoo "agree[d] that it shall pay to [White Rock] the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance." Vesttoo further agreed to "indemnify the [White Rock] Segregated Account in the event the assets of the [White Rock] Segregated Account are insufficient to meet the obligations of the [White Rock] Segregated Account."[12]

27.  Each PSA between White Rock and the Vesttoo entity chooses Bermuda law and includes an arbitration provision stating that "[a]ny disputes arising out of or relating to this Agreement or the breach, termination or validity hereof, shall be referred to and settled by final binding arbitration in Hamilton, Bermuda by a panel of three arbitrators."[13]

**The Vesttoo Fraudulent Letters Of Credit Are Revealed.**

28.  On information and belief, on or about July 14, 2023, an insurer demanded payment in full under one of the LOCs procured by Vesttoo, issued by China Construction Bank ("**CCB**"). The insurer's request for payment was denied, and CCB informed the insurer's counsel that the LOC was not issued by CCB and appeared to be fraudulent. On information and belief, CCB subsequently reviewed the LOC and confirmed that CCB took the position that the LOC was not valid.

29.  The discovery that CCB would not honor the LOC shocked the marketplace. It created grave concerns as to the integrity of the other LOCs procured by Vesttoo. These events unleashed numerous reports in media outlets worldwide, forcing Vesttoo to admit publicly that its procedures were circumvented, leading to the apparent fraud.[14] Certain rating agencies have

---

[12] Exhibit 2, §§ 4-5.
[13] Exhibit 2, § 10.
[14] Meir Orbach, Tomer Ganon, Almog Azar, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* CALCALIST (July 23, 2019),

opined on the matter as well and issued commentaries, one of which estimating that the total size of affected transactions is "between $5 billion and $10 billion."[15]

30.     The discovery of the fraud led to an exodus of Vesttoo's top leadership.[16]  On information and belief, the following executives resigned from Vesttoo immediately after the fraud was revealed: the Chief Financial Officer, Chief Commercial Officer, the Chief Legal Officer, and the Deputy-Chief Legal Officer.  A number of other high-ranking employees have reportedly resigned, too, leaving Vesttoo without appropriate management.

**White Rock Sends A Demand Letter To Vesttoo.**

31.     On July 27, 2023, upon learning of the allegations of fraud surrounding the LOCs, White Rock's undersigned counsel sent a letter to Vesttoo's counsel to provide notice of Vesttoo's breach of the PSAs.[17]  White Rock's counsel stated that White Rock "now understands that the banks identified in the Letters of Credit provided by Vesttoo have taken the position that the Letters of Credit are fraudulent.  Indeed, Vesttoo has stated publicly that its procedures were circumvented, leading to the apparent fraud.[18]  White Rock's counsel put Vesttoo on notice that "Vesttoo is in breach of its obligations under the PSAs, including, but not limited to, its obligation to provide Acceptable Security[,]" demanding that "Vesttoo immediately return all distributions

---

https://www.calcalistech.com/ctechnews/article/rjpbxmhc2#:~:text=The%20allegedly%20fake%20letters%20of%20credit%20%28LOCs%29%20provided,appears%20to%20have%20been%20unaware%20of%20the%20situation; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023) https://www.wsj.com/articles/israeli-ai-startup-vesttoo-sparks-a-global-insurance-scandal-cdeb5fee; Steve Evans, *FBI investigating LOC fraud allegations linked to Vesttoo collateral*, ARTEMIS (Aug. 1, 2023), https://www.artemis.bm/news/fbi-investigating-loc-fraud-allegations-linked-to-vesttoo-collateral/.
[15]  DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023) (stating that "we estimate the total size of outstanding transactions to be between $5 billion and $10 billion based on the Company's total revenue of approximately $200 million in 2022.") (*available at*: www.dbrsmorningstar.com/research/417719).
[16] Meir Orbach, *Vesttoo's top legal and financial executives leave the company amid alleged fraud scandal*, CALCALIST (July 19, 2023), https://www.calcalistech.com/ctechnews/article/hjfha00b5n?utm_source=taboola&utm_medium=referral&utm_content=internal.
[17]  A true and correct copy of White Rock's July 27, 2023 letter is attached hereto as Exhibit 4.
[18]  *Id.*

made from the Segregated Accounts and comply with its obligations under the PSAs, including (but not limited to) Clauses 3, 4 and 5 of the PSAs."[19]

32. Vesttoo responded in a letter the next day, ignoring White Rock's demands, but again admitting that "fraudulent letters of credit" had been provided. Vesttoo also admitted that "there is still much that is unknown" to Vesttoo.[20]

33. On August 2, 2023, White Rock's counsel emailed Vesttoo to inquire about information Vesttoo offered to provide. To date, Vesttoo had not responded to White Rock's subsequent requests for information.

**Vesttoo Spirals Into Crisis.**

34. After news of the LOC fraud scandal broke, Vesttoo was catapulted into crisis, causing it to lay off over 75% of its employees. CEO and co-founder Yaniv Bertele wrote, "The only way to give the company a fighting chance of survival and getting back to a path of sustainable growth is to keep on a small core of people that represent bare operational necessity."[21] This "small core of people" apparently did not include Bertele himself. On or about August 2, 2023, Vesttoo's Board of Directors placed Bertele, and Chief Financial Engineer and co-founder Alon Lifshitz on paid leave, stating they could not return to the company until further notice, effectively terminating them.[22] The removal of Messrs. Bertele and Lifshitz reportedly resulted from a conclusion by the committee that examined the alleged fraud that current management did not regularly report to the board of directors and concealed information leading up to the fraud's exposure.[23] This same month, Vesttoo also announced its plans to close its Tokyo, Hong Kong,

---

[19] *Id.*
[20] A true and correct copy of Vesttoo's July 28, 2023 letter is attached hereto as Exhibit 5.
[21] Meir Orbach, *Vesttoo laying off 75% of employees amid fraud scandal,* CALCALIST (Jan. 8, 2023).
[22] Almog Azar, *Vesttoo CEO pushed out of company after fake collateral scandal*, CALCALIST (Aug. 3, 2023) https://www.calcalistech.com/ctechnews/article/syjylb00i2; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023).
[23] *Id.*

and Seoul offices.[24] Vesttoo is now fighting for its survival with significantly less ammunition: no founders, a significantly diminished executive team, 25% of its work force, and nearly half of its offices. Grabbing at any lifeline, Vesttoo may take measures to dissipate funds, including advances pulled from White Rock's insurer client premium payments, in order to survive, rendering any future relief in arbitration ineffectual.

### White Rock's Forthcoming Arbitrations.

35. White Rock intends imminently to file requests for arbitration against Vesttoo in Bermuda, in accordance with the PSAs' arbitration provisions (*see* PSA, § 10).[25]

36. White Rock will request the arbitral tribunal to declare that Vesttoo is in breach of, among other things, its obligation to provide Acceptable Security under the PSAs as a result of the fraudulent LOCs it presented to White Rock and its clients. White Rock will further request the arbitral tribunal to order Vesttoo to immediately return all distributions made from the White Rock Segregated Accounts, provide Acceptable Security for each White Rock Segregated Account, and indemnify White Rock in accordance with Vesttoo's obligations under the PSAs.

### CAUSE OF ACTION FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION

37. CPLR § 7502(c), made applicable herein through Rule 64 of the Federal Rules of Civil Procedure (the "**Rules**"), authorizes "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced inside or outside [of New York] . . . [where] the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." *See*, *e.g.*, *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd., 876 F. Supp. 482, 487* (S.D.N.Y. 1994), ("Section 7502(c) permits a court to order an attachment or an

---

[24] *Fintech firm Vesttoo to lay off 75% staff, close some offices in Asia*, BFSI THE ECONOMIC TIMES (Aug. 3, 2023) https://bfsi.economictimes.indiatimes.com/news/fintech/fintech-firm-vesttoo-to-lay-off-75-staff-close-some-offices-in-asia/102369883.
[25] White Rock's request for arbitration will be filed within the 30-day period prescribed in CPLR § 7502(c).

injunction in aid of arbitration.")  This Court similarly has the power to issue injunctions in aid of foreign arbitration pursuant to Rule 65.  *See*, *e.g.*, *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, No. 19 CIV. 3930 (CM), 2019 WL 2240204, at *16 (S.D.N.Y. May 14, 2019), *aff'd*, 789 F. App'x 288 (2d Cir. 2020).

38. White Rock intends imminently to commence arbitration proceedings against Vesttoo in Bermuda, and certainly "within thirty days of the granting of the provisional relief" as required under CPLR § 7502(c).

39. As set forth in the Memorandum of Law in support of this Verified Petition (the "**Memorandum of Law**"), White Rock satisfies the three traditional criteria for the granting of temporary relief: (a) White Rock has a likelihood of success on the merits; (b) there is a danger of irreparable harm in the absence of temporary injunctive relief; and (c) the balance of equities favors granting the relief sought.  Moreover, arbitration awards to which White Rock may be entitled may be rendered ineffectual without the requested provisional relief.

40. As set forth more fully in the Memorandum of Law, and considering that this matter involves a large-scale, global fraudulent scheme still under nascent investigation, if the relief requested is not granted by the Court, there is substantial risk that Vesttoo's assets will be concealed or dissipated, making it near impossible to recover these funds.

41. Vesttoo has failed to provide assurance that it will meet its obligations to White Rock under the PSAs or that it would preserve sufficient funds and assets for that purpose.  To avoid any further harm and ensure that White Rock can obtain effective relief in the arbitrations, White Rock requests injunctive relief in aid of arbitration preserving the status quo by freezing Vesttoo's assets, subject to the ordinary course exceptions contained in the proposed order annexed hereto.

42. White Rock requests that it be permitted to take expedited discovery in preparation for the preliminary injunction hearing. "Expedited discovery is often available in cases where preliminary relief is sought." *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, 1994 WL 719696 at *3 (S.D.N.Y. Dec. 28, 1994), *disfavored on other grounds*.

43. No previous application has been made to this or to any other court for the relief sought herein and no other provisional remedy has been sought in this or any other Court. White Rock does intend to seek relief through the Israeli judicial system to freeze of Vesttoo's assets in Israel.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests an order pending resolution of the forthcoming arbitration proceedings awarding the following relief:

1. Injunctive relief in aid of the forthcoming arbitrations enjoining Vesttoo from transferring, withdrawing, assigning, alienating, selling, pledging, encumbering, concealing, hypothecating, or disposing any of its assets, including funds in Vesttoo's bank accounts, held in bank accounts with Truist Bank, except for funds in the amount of $1,000,000, necessary to pay Vesttoo's employees, taxes, and existing subcontractors and suppliers essential to Vesttoo's ordinary course operations;

2. Leave to immediately commence document discovery and deposition discovery, commanding Vesttoo to respond to White Rock's document requests within 7 days of service, and commanding Truist Bank, Gaurav Wadhwa, Lauren Smith, Daniel Goldfried, David Schonbrun, Oran Barkai, Minas Kalachian, Ron Adiel, Nick Graham, and Joseph Havivto appear for deposition in the offices of White Rock's counsel, at a date to be noticed by White Rock's counsel 5 days prior to the deposition;

3. Attorney's fees and costs in relation to the instant proceeding; and

4.       Any other monetary, injunctive, or other relief that, in the interest of justice, the Court deems necessary and proper.

| | |
|---|---|
| DATED:   New York, New York<br>         August 10, 2023 | **QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br><br>By: _____<br>   Renita Sharma<br>   Michael B. Carlinsky<br>   Katherine A. Lemire<br>   Jonathan Feder<br>   Yehuda Goor<br>   Jacqueline Stykes<br>   51 Madison Avenue, 22nd Floor<br>   New York, NY 10010<br>   Tel: (212) 849-7000<br>   Fax: (212) 849-7100<br><br>   *Attorneys for Petitioner White Rock<br>   Insurance (SAC) Ltd.* |

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, John English declares as follows:

I am the Chief Executive Officer of Aon Captive and Insurance Management, managers of White Rock Insurance (SAC) Ltd. I have read the foregoing Petition and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 10th day of August, 2023, at Hamilton

_____
John English