**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

---

WHITE ROCK INSURANCE (SAC) LTD.,

        Petitioner,

    v.

VESTTOO LTD. and its subsidiaries,[1]

        Respondents.

Civil Action No.

---

**MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION FOR INJUNCTIVE RELIEF IN AID OF FOREIGN ARBITRATION AND FOR EXPEDITED DISCOVERY**

---

[1]    A list of Vesttoo Ltd.'s subsidiaries is attached hereto as Exhibit 1.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.......................................................................................................4

ARGUMENT ..............................................................................................................................11

I.      White Rock Is Entitled To A Preliminary Injunction Pending Arbitration. ...................12

        A.      An Award In Arbitration Would Be Rendered Ineffectual If Vesttoo
                Conceals Or Dissipates Its Assets. ..............................................................13

        B.      White Rock Will Likely Prevail On The Merits In The Arbitration...................14

        C.      White Rock Will Suffer Irreparable Harm Absent Injunctive Relief. .................15

        D.      The Public Interest and Balance Of Equities Favor Granting An
                Injunction. ...............................................................................................18

II.     The Court Has Authority To Freeze Vesttoo's Assets.....................................................19

III.    An Immediate Temporary Restraining Order Is Warranted. ............................................20

IV.     No Bond Should Be Required Or Any Security Should Be *De Minimis*.........................21

V.      White Rock Is Entitled To Expedited Discovery And An Order To Preserve
        Evidence....................................................................................................................22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*,
  1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ...........................................................................23

*AIM Int'l Trading LLC v. Valcucine SpA.*,
  188 F. Supp. 2d 384 (S.D.N.Y. 2002)....................................................................................21

*Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*,
  876 F. Supp. 482 (S.D.N.Y. 1994) ...................................................................................11, 12

*Ayyash v. Bank Al-Madina*,
  233 F.R.D. 325 (S.D.N.Y. 2005) ............................................................................................23

*Basank v. Decker*,
  449 F. Supp. 3d 205 (S.D.N.Y. 2020)....................................................................................16

*Benihana, Inc. v. Benihana of Tokyo*,
  LLC, 784 F.3d 887 (2d Cir. 2015) ....................................................................................12, 18

*Bridge Assocs. LLC v. Contract Mail Co.*,
  No. 110639/04, 2004 WL 6031081 (N.Y. Sup. Ct. Nov. 15, 2004)........................................13

*Clarkson Co. v. Shaheen*,
  544 F.2d 624 (2d Cir. 1976)...................................................................................................22

*Deckert v. Indep. Shares Corp.*,
  311 U.S. 282 (1940)................................................................................................................18

*Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp.*,
  897 N.Y.S.2d 669 (Sup. Ct.), *aff'd as modified*, 889 N.Y.S.2d 793 (2009) ...........................15

*DeWitt Stern Grp., Inc. v. Eisenberg*,
  No. 13 CIV. 3060 RWS, 2013 WL 2420835 (S.D.N.Y. June 4, 2013) ...................................22

*Doctor's Assocs., Inc. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996)......................................................................................................22

*Espiritu Santo Holdings, LP v. L1bero Partners, LP*,
  No. 19 CIV. 3930 (CM), 2019 WL 2240204 (S.D.N.Y. May 14, 2019), *aff'd*,
  789 F. App'x 288 (2d Cir. 2020) ......................................................................................11, 12

*In re Feit & Drexler, Inc.*,
  760 F.2d 406 (2d Cir. 1985).....................................................................................................17

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
  No. 20-CV-181 (KMK), 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)....................................12

*Google LLC v. Starovikov*,
  No. 1:21-CV-10260-DLC, 2021 WL 6754263 (S.D.N.Y. Dec. 16, 2021)............................21

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No.*
  *70 of Alameda Cnty.*,
  415 U.S. 423 (1974)................................................................................................................21

*Gucci Am., Inc. v. Weixing Li*,
  768 F.3d 122 (2d Cir. 2014)...................................................................................................19

*Interoil LNG Holdings, Inc. v. Merrill Lynch PNG LNG Corp.*,
  874 N.Y.S.2d 439 (N.Y. Sup. 2009)......................................................................................12

*Jet Experts, LLC v. Asian Pac. Aviation Ltd.*,
  602 F. Supp. 3d 636 (S.D.N.Y. 2022)....................................................................................18

*Mason Tenders Dist. Council Pension Fund v. Messera*,
  No. 95 CIV. 9341 (RWS), 1997 WL 223077 (S.D.N.Y. May 1, 1997), *as*
  *amended* (May 7, 1997), *aff'd sub nom. Mason Tenders Dist. Council Pension*
  *Fund v. Pervale Contracting Inc.*, 131 F.3d 131 (2d Cir. 1997) ...........................................19

*Mishkin v. Kenney & Branisel, Inc.*,
  609 F. Supp. 1254 (S.D.N.Y.), *aff'd sub nom. Mishkin v. Branisel*, 779 F.2d
  35 (2d Cir. 1985), *and aff'd sub nom. Mishkin v. Kenney Branisel Inc.*, 779
  F.2d 35 (2d Cir. 1985)............................................................................................................17

*Moquinon, Ltd. v. Gliklad*,
  58 N.Y.S.3d 874 (N.Y. Sup. 2017)........................................................................................13

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010)....................................................................................22

*New York Land Co. v. Republic of Philippines*,
  634 F. Supp. 279 (S.D.N.Y.), *aff'd sub nom. Republic of Philippines v.*
  *Marcos*, 806 F.2d 344 (2d Cir. 1986) ...................................................................................16

*NML Capital, Ltd. v. Republic of Argentina*,
  2012 WL 5895784 (S.D.N.Y. Nov. 21, 2012)........................................................................18

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
  No. 11 CIV. 3489 JMF, 2013 WL 1915330 (S.D.N.Y. May 9, 2013) ............................20, 21

*Pashaian v. Eccelston Properties, Ltd.*,
  88 F.3d 77 (2d Cir. 1996)..........................................................................................16, 17, 19

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*,
   144 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................................... 17

*Republic of Panama v. Republic Nat. Bank of New York*,
   681 F. Supp. 1066 (S.D.N.Y. 1988) ...................................................................... 16

*Republic of Philippines v. Marcos*,
   806 F.2d at 356 (2d Cir. 1986) .............................................................................. 19

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) .............................................................. 12, 18

*Ryan v. Volpone Stamp Co.*,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000) .................................................................... 19

*Sea Carriers Corp. v. Empire Programs, Inc.*
   2006 WL 3354139 (S.D.N.Y. 2006) ...................................................................... 17

*SingularDTV GmbH v. LeBeau*,
   2022 WL 1082557 (S.D.N.Y. Apr. 6, 2022) ........................................................... 23

*Witham v. VFinance Invs., Inc.*,
   851 N.Y.S.2d 75 (Sup. Ct. 2007), *aff'd*, 860 N.Y.S.2d 98 (2008) .................... 13, 15

## Rules

Fed. R. Civ. P 26(d) ................................................................................................ 23, 24

Fed. R. Civ. P. 64 ................................................................................................... 11, 12

Fed. R. Civ. P. 65 ............................................................................ 11, 17, 19, 20, 21, 22

Fed. R. Civ. P. 65(b) ..................................................................................................... 21

Fed. R. Civ. P .65(c) ...................................................................................................... 21

N.Y. CPLR § 7502(c) ................................................................................ 10, 11, 12, 13

## Other Authorities

Alan Gallindoss, *Vesttoo Fraud Could Be Worth As Much As $4 Billion,* JEWISH
   BUSINESS NEWS (July 20, 2023) ...................................................................... 14, 20

Almog Azar, *Vesttoo CEO pushed out of company after fake collateral scandal*,
   CALCALIST (Aug. 3, 2023) .................................................................................... 10

Bermuda Segregated Accounts Act 2000 ......................................................................... 2

DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023) .................................................................8

*Fintech firm Vesttoo to lay off 75% staff, close some offices in Asia*, BFSI THE ECONOMIC TIMES (Aug. 3, 2023) ........................................................................10

Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023) ................................................................8, 10

Judy Greenwald and Matthew Lerner, *Vesttoo fallout likely to have lasting effect on market*, BUSINESS INSURANCE (Aug. 1, 2023) ..............................................14, 20

Meir Orbach, Tomer Ganon,, Almog Azar, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* CALCALIST (July 23, 2019) ...................8

Meir Orbach, Tomer Ganon, Azar Almog, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* (July 19, 2023) .................................4

Meir Orbach, *Vesttoo laying off 75% of employees amid fraud scandal*, CALCALIST (Jan. 8, 2023) ..................................................................................10

Meir Orbach, *Vesttoo's top legal and financial executives leave the company amid alleged fraud scandal*, CALCALIST (July 19, 2023) .......................................8

Steve Evans, *FBI investigating LOC fraud allegations linked to Vesttoo collateral*, ARTEMIS (Aug. 1, 2023) ...........................................................................8

Steven Scheer, *Fintech Vesttoo to Slash Jobs After Fake Collateral Scandal*, INSURANCE JOURNAL (Aug. 2, 2023) ...........................................................14, 20

*Vesttoo Closes $80 Million Series C Financing Round, Increasing Valuation to $1 Billion* (Oct. 25, 2022) ...................................................................................5

Petitioner White Rock Insurance (SAC) Ltd. ("White Rock") submits this Memorandum of Law in support of its Verified Petition for Injunctive Relief in Aid of Foreign Arbitration, seeking to secure the assets of Respondents Vesttoo Ltd. and its subsidiaries listed in Exhibit 1 (Vesttoo Ltd. and its subsidiaries, collectively, "Vesttoo") held in bank accounts with Truist Bank, which upon information and belief are wholly-owned and controlled by Vesttoo, pending an arbitration of White Rock's claims against Vesttoo, stemming from an apparent large-scale fraudulent scheme surrounding letters of credit ("**LOC**") provided by Vesttoo to collateralize reinsurance transactions facilitated by White Rock on behalf of its insurer clients.  The real victims here are White Rock's clients who were the beneficiaries of these fraudulent LOC.  Although primarily a middle man, with the goal of protecting its clients White Rock is exercising its contractual rights against Vesttoo to recover funds and obtain acceptable security for the benefit of its clients.  White Rock also seeks expedited discovery so that it may uncover further details regarding the bank accounts and other Vesttoo assets.

## PRELIMINARY STATEMENT

Injunctive relief from this Court to freeze any dissipation of Vesttoo's remaining assets is White Rock's one realistic opportunity to ensure an arbitral award against Vesttoo, for its fraudulent scheme impacting more than $2 billion in LOC's provided to White Rock and its clients, is not rendered ineffectual.  Unless enjoined by this Court, the same individuals who initiated Vesttoo's fraud and pocketed millions of dollars of premiums from White Rock's clients while providing fraudulent LOCs to support those transactions will have an open window to strike again dissipating Vesttoo's assets and denying White Rock the ability to recover on its anticipated arbitration award.

The funds at issue belong to Vesttoo, a company in crisis.  In the face of a potential multi-billion-dollar fraud, Vesttoo has recently laid off 75% of its workforce and had many key

employees voluntarily resign.  Vesttoo's leadership is gone—including its CEO co-founder, Chief Financial Engineer co-founder, Chief Financial Officer, Chief Commercial Officer, Chief Legal Officer, and Deputy Chief Legal Officer—and the company has recently announced plans to close its Tokyo, Hong Kong, and Seoul offices.  Vesttoo continues to investigate the fraud admitting "there is still much that is unknown."  But one thing is abundantly clear, Vesttoo sent White Rock and its clients fraudulent letters of credit and materially breached the Participating Shareholder's Agreements ("**PSAs**") surrounding these reinsurance transactions in doing so.  Although primarily a facilitator, White Rock must exercise its contractual rights against Vesttoo for the benefit and protection of White Rock's insurer clients.

White Rock, an indirect wholly-owned subsidiary of Aon Plc ("**Aon**"), is registered under the Bermuda Segregated Accounts Act 2000 and is empowered by Bermudian law to offer reinsurance solutions through the utilization of "cell" or "segregated account" facilities that enable White Rock to serve as a pass-through entity for reinsurance coverage.  White Rock uses these cell structures as "transformers" for its clients to access third-party capital through entities like Vesttoo where those parties have already agreed to the general terms of the reinsurance transaction, such as premiums to be paid, terms, etc.  White Rock then holds collateral for a particular reinsurance solution in a specific cell and  at all times, the financial obligations under the reinsurance contract are limited to the value of the assets in the segregated account.

For most transactions at issue, Aon insurance and reinsurance brokers partnered with certain lender clients who wished to consider investments in start-up companies or other firms with significant intellectual property ("**IP**") assets who needed funding to support their growth. Recognizing that the value of IP assets may be fluid, Aon's client lenders would obtain collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and held

in a segregated account created by White Rock to facilitate reinsurance transactions agreed to between client insurers and Vesttoo. Vesttoo's role was to contract with investors for investment capital as collateral—in the form of letters of credit—to secure the reinsurance obligations and provide recovery to insurers in the event of default (and subsequent claims under the collateral protection insurance). Accordingly, under this structure, reinsurance coverage for an insurance provider is secured entirely by an ability to draw down on the LOCs presented by Vesttoo. Needless to say, this whole structure is imperiled if the LOCs Vesttoo secured are fraudulent.

Vesttoo now admits that multiple LOCs presented to White Rock and its clients were fraudulent and on information and belief the fraudulent LOCs could total upwards of $2 billion. This is a clear breach of Vesttoo's obligations under the PSAs behind the segregated cells, including but not limited to, its obligations to provide acceptable security to collateralize each cell.

Further, Vesttoo has already received considerable sums in the form of premium advances based on these fraudulent letters of credit. Cedents (parties who transfer a debt or obligation to another party) pay premium amounts which are deposited into each cells according to standard industry practice and contract. The shareholder (in this case Vesttoo) can then pull advances/distributions from those premiums paid, which Vesttoo did. While White Rock plays merely an administrative function with respect to the flow of premiums/advances, it does hold a contractual right under the PSAs to demand the refund of those advances.

Following news of this fraudulent scheme and Vesttoo's subsequent spiral into crisis, White Rock demanded the return of premium advances taken from funds paid by White Rock's clients into associated cells. Vesttoo has ignored demands to immediately return all distributions paid under the relevant agreements and comply with its obligations under the PSAs. Nor has Vesttoo provided any assurances that it will forestall this attempted theft by refusing to allow any

transfer or withdrawal of funds from the accounts.  On information and belief, Vesttoo intends to remove all or substantially all funds from its United States bank accounts and dissipate the funds making them near impossible to recover.

White Rock's agreements with Vesttoo's subsidiaries contain an arbitration provision stating that any dispute arising out of or relating to the agreements shall be resolved in binding arbitration in Bermuda.  White Rock intends imminently to file demands for arbitration against those Vesttoo entities in order to enforce its rights under the agreements.  But those arbitration proceedings will be futile absent injunctive relief from this Court preventing Vesttoo—a privately held foreign company involved in apparent fraud—from concealing or dissipating its assets.

## FACTUAL BACKGROUND

This matter arises from Vesttoo's presentation of fraudulent LOCs to White Rock and its clients in violation of Vesttoo's agreements with White Rock.

### Vesttoo Raises $110 Million And Reaches $1 Billion Valuation.

Founded in 2018 by Yaniv Bertele, Ben Zickel and Alon Lifshitz, each of whom owns about 24% of the company's shares,[2] Vesttoo is a privately-held company that purports to use a digital platform for assessing risk in insurance investments, claiming to enable insurance companies to obtain reinsurance coverage at a lower cost from investors through the capital markets.  Vesttoo's subsidiary, Vesttoo Reinsurance Intermediary Services Inc., is licensed by the New York State Department of Financial Services.

Vesttoo defines itself as a "leading technology-driven global insurance risk transfer platform," claiming it utilizes "AI-powered technology with expertise in data science, insurance, and finance" so that "insurers have the capital they need" and "investors have opportunities to

---

[2]  Meir Orbach, Tomer Ganon, Azar Almog, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* (July 19, 2023) https://www.calcalistech.com/ctechnews/article/rjpbxmhc2.

diversify with uncorrelated, low-volatility insurance-linked assets."[3]   Vesttoo had raised $110 million from investors since its founding and, in October 2022, it reported that its valuation had reached $1 billion.

**Vesttoo's Collaboration With Aon And White Rock On Collateral Protection Insurance.**

Near the end of 2021, Aon and its clients began collaborating with Vesttoo in a variety of different transactions, based on Vesttoo's representations and assurances to Aon and its insurer clients regarding its ability to procure acceptable collateral.  This collaboration began with IP owners seeking loans against their IP.  The lenders in those transactions would then seek collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and transformed into reinsurance through a segregated account held by White Rock.  A typical collateral protection insurance transaction chain often took the following form:

- Company contracts with Lender for IP-backed loan;
- Lender, in turn, contracts with Insurance Provider for collateral protection insurance in the event of a default on the loan;
- Insurance Provider and Vesttoo arrange for reinsurance, and negotiate associated terms, using White Rock as a contractual counterparty and transformer which issued the policy and accepted the premium to be paid to Vesttoo; and
- Vesttoo contracts with investors for investment capital; investors provide letters of credit issued by banks as collateral to secure White Rock's obligations with Insurance Provider as beneficiary to the LOC and provides Insurance Provider access to funds in the event of default.

<u>Collateral Protection Insurance Overview</u>



---

[3]   *Vesttoo Closes $80 Million Series C Financing Round, Increasing Valuation to $1 Billion*, (Oct. 25, 2022) https://vesttoo.com/pr/vesttoo-closes-80-million-series-c-financing-round-increasing-valuation-to-1-billion/.

**The Participating Shareholder Agreements Between Vesttoo And White Rock And Their Arbitration Provision.**

In each instance where it issued a reinsurance policy to cedents through these cell arrangements, White Rock entered into a Participating Shareholder Agreement with a Vesttoo entity (such agreements, collectively, the "**PSA"**).[4]  Parties to each PSA included White Rock, White Rock acting in respect of one of its segregated accounts, and a unique Vesttoo subsidiary organized for the purpose of that transaction (*see* Exhibit 2).  Under the PSAs, White Rock agreed to make the Vesttoo entity (*i.e.*, the Shareholder) the owner of each segregated account with 100% interest in its proceeds (less losses, expenses, and fees).

Under each PSA, the Vesttoo entity agreed, among other things, to provide "Acceptable Security" to White Rock to secure both an indemnity obligation to White Rock and the liability and collateral requirements set forth in White Rock's reinsurance certificate with the applicable cedent, as negotiated between the insurer and Vesttoo.  As to security, the PSAs state that

> [Vesttoo] agrees to provide Acceptable Security to or for the benefit of the [White Rock] Segregated Account, separately to enable the [White Rock] Segregated Account to meet any and all liabilities and any and all collateral requirements arising pursuant to the terms of the Reinsurance Agreement. [Vesttoo] further agrees to indemnify the [White Rock] Segregated Account in the event the assets of the Segregated Account are insufficient to meet the obligations of the [White Rock] Segregated Account.[5]

As to the definition of the term "Acceptable Security," the PSAs provide that

> [Vesttoo] shall provide [White Rock] and/or the [White Rock] Segregated Account with security, in a form acceptable to [White Rock], for [Vesttoo's] obligations, as shall be determined from time to time by the [White Rock] and [Vesttoo]

---

[4]   A form PSA was used in each instance.  A true and correct copy of a representative executed PSA is attached hereto as Exhibit 2.

[5]   Exhibit 2 § 5.  For each reinsurance transaction, White Rock, a Vesttoo subsidiary, and Aon Insurance Managers (Bermuda) Ltd. ("**Aon IMB**") also entered into a Cell Management Agreement, which stated that neither Aon IMB nor White Rock can be held responsible or liable to Vesttoo or any other party for certain failures by Vesttoo to properly perform its obligations.  *See* Form of Cell Management Agreement, § 9.  A true and correct copy of the Form of Cell Management Agreement is attached hereto as Exhibit 3.

("Acceptable Security"). [Vesttoo] **will also provide a Letter of Credit to be issued on behalf of the [White Rock] Segregated Account, for the benefit of the Insured**.[6]

Next, in Clause 4 of the PSAs, Vesttoo agreed to indemnify White Rock "to the extent the balance of the profits and losses allocated . . . less cumulative dividends paid, are less than zero at any point in time as calculated by [White Rock]."  In that event, Vesttoo "agree[d] that it shall pay to [White Rock] the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance."  Vesttoo further agreed to "indemnify the [White Rock] Segregated Account in the event the assets of the [White Rock] Segregated Account are insufficient to meet the obligations of the [White Rock] Segregated Account."[7]

Each PSA between White Rock and the Vesttoo entity chooses Bermuda law and includes an arbitration provision stating that "[a]ny disputes arising out of or relating to this Agreement or the breach, termination or validity hereof, shall be referred to and settled by final binding arbitration in Hamilton, Bermuda by a panel of three arbitrators."[8]

**The Vesttoo Fraudulent Letters Of Credit Are Revealed.**

On information and belief, on or about July 14, 2023, an insurer demanded payment in full under one of the LOCs procured by Vesttoo, issued by China Construction Bank ("**CCB**").  The insurer's request for payment was denied, and CCB informed the insurer's counsel that the LOC was not issued by CCB and appeared to be fraudulent.  On information and belief, CCB subsequently reviewed the LOC and confirmed that CCB took the position that the LOC was not valid.

---

[6]   Exhibit 2, Schedule B (emphasis added).
[7]   Exhibit 2, §§ 4-5.
[8]   Exhibit 2, § 10.

The discovery that CCB would not honor the LOC shocked the marketplace. It created grave concerns as to the integrity of the other LOCs procured by Vesttoo. These events unleashed numerous reports in media outlets worldwide, forcing Vesttoo to admit publicly that its procedures were circumvented, leading to the apparent fraud.[9] Certain rating agencies have opined on the matter as well and issued commentaries, one of which estimating that the total size of affected transactions is "between $5 billion and $10 billion."[10]

The discovery of the fraud led to an exodus of Vesttoo's top leadership.[11] On information and belief, the following executives resigned from Vesttoo immediately after the fraud was revealed: the Chief Financial Officer, the Chief Commercial Officer, the Chief Legal Officer, and the Deputy-Chief Legal Officer. A number of other high-ranking employees have reportedly resigned, too, leaving Vesttoo without appropriate management.

**White Rock Sends A Demand Letter To Vesttoo.**

On July 27, 2023, upon learning of the allegations of fraud surrounding the LOCs, White Rock's undersigned counsel sent a letter to Vesttoo's counsel to provide notice of Vesttoo's breach of the PSAs.[12] White Rock's counsel stated that White Rock "now understands that the banks

---

[9]    Meir Orbach, Tomer Ganon, Almog Azar, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* CALCALIST (July 23, 2019), https://www.calcalistech.com/ctechnews/article/rjpbxmhc2#:~:text=The%20allegedly%20fake%20letters%20of%20 credit%20%28LOCs%29%20provided,appears%20to%20have%20been%20unaware%20of%20the%20situation; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023) https://www.wsj.com/articles/israeli-ai-startup-vesttoo-sparks-a-global-insurance-scandal-cdeb5fee; Steve Evans, *FBI investigating LOC fraud allegations linked to Vesttoo collateral*, ARTEMIS (Aug. 1, 2023), https://www.artemis.bm/news/fbi-investigating-loc-fraud-allegations-linked-to-vesttoo-collateral/.

[10]    DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023) (stating that "we estimate the total size of outstanding transactions to be between $5 billion and $10 billion based on the Company's total revenue of approximately $200 million in 2022.") (*available at*: www.dbrsmorningstar.com/research/417719).

[11]    Meir Orbach, *Vesttoo's top legal and financial executives leave the company amid alleged fraud scandal*, CALCALIST (July 19, 2023), https://www.calcalistech.com/ctechnews/article/hjfha00b5n?utm_source=taboola&utm_medium=referral&utm_cont ent=internal.

[12]    A true and correct copy of White Rock's July 27, 2023 letter is attached hereto as Exhibit 4.

identified in the Letters of Credit provided by Vesttoo have taken the position that the Letters of Credit are fraudulent.  Indeed, Vesttoo has stated publicly that its procedures were circumvented, leading to the apparent fraud.[13]  White Rock's counsel put Vesttoo on notice that "Vesttoo is in breach of its obligations under the PSAs, including, but not limited to, its obligation to provide Acceptable Security[,]" demanding that "Vesttoo immediately return all distributions made from the Segregated Accounts and comply with its obligations under the PSAs, including (but not limited to) Clauses 3, 4 and 5 of the PSAs."[14]

Vesttoo responded in a letter the next day, ignoring White Rock's demands, but again admitting that "fraudulent letters of credit" had been provided.  Vesttoo also admitted that "there is still much that is unknown" to Vesttoo.[15]

On August 2, 2023, White Rock's counsel emailed Vesttoo to inquire about information Vesttoo offered to provide.  To date, Vesttoo had not responded to White Rock's subsequent requests for information.

**Vesttoo Spirals Into Crisis.**

After news of the LOC fraud scandal broke, Vesttoo was catapulted into crisis, causing it to lay off over 75% of its employees.  CEO and co-founder Yaniv Bertele wrote, "The only way to give the company a fighting chance of survival and getting back to a path of sustainable growth is to keep on a small core of people that represent bare operational necessity."[16]  This "small core of people" apparently did not include Bertele himself.  On or about August 2, 2023, Vesttoo's Board of Directors placed Bertele, and Chief Financial Engineer and co-founder Alon Lifshitz on paid leave, stating they could not return to the company until further notice, effectively terminating

---

13   *Id.*
14   *Id.*
15   A true and correct copy of Vesttoo's July 28, 2023 letter is attached hereto as Exhibit 5.
16   Meir Orbach, *Vesttoo laying off 75% of employees amid fraud scandal,* CALCALIST (Jan. 8, 2023).

them.[17]  The removal of Messrs. Bertele and Lifshitz reportedly resulted from a conclusion by the committee that examined the alleged fraud that current management did not regularly report to the board of directors and concealed information leading up to the fraud's exposure.[18]  This same month, Vesttoo also announced its plans to close its Tokyo, Hong Kong, and Seoul offices.[19]  Vesttoo is now fighting for its survival with significantly less ammunition: no founders, a significantly diminished executive team, 25% of its work force, and nearly half of its offices. Grabbing at any lifeline, Vesttoo may take measures to dissipate funds, including advances pulled from White Rock's insurer client premium payments, in order to survive, rendering any future relief in arbitration ineffectual.

**White Rock's Forthcoming Arbitrations.**

White Rock intends imminently to file requests for arbitration against Vesttoo in Bermuda, in accordance with the PSAs' arbitration provisions (*see* PSA, § 10).[20]

White Rock will request the arbitral tribunal to declare that Vesttoo is in breach of, among other things, its obligation to provide Acceptable Security under the PSAs as a result of the fraudulent LOCs it presented to White Rock and its clients.  White Rock will further request the arbitral tribunal to order Vesttoo to immediately return all distributions made from the White Rock Segregated Accounts, provide Acceptable Security for each White Rock Segregated Account, and indemnify White Rock in accordance with Vesttoo's obligations under the PSAs.

---

[17]   Almog Azar, *Vesttoo CEO pushed out of company after fake collateral scandal*, CALCALIST (Aug. 3, 2023) https://www.calcalistech.com/ctechnews/article/syjylb00i2; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023).
[18]   *Id.*
[19]   *Fintech firm Vesttoo to lay off 75% staff, close some offices in Asia*, BFSI THE ECONOMIC TIMES (Aug. 3, 2023) https://bfsi.economictimes.indiatimes.com/news/fintech/fintech-firm-vesttoo-to-lay-off-75-staff-close-some-offices-in-asia/102369883.
[20]   White Rock's request for arbitration will be filed within the 30-day period prescribed in CPLR § 7502(c).

**ARGUMENT**

To avoid further harm and to ensure that White Rock can obtain effective relief in the forthcoming Bermuda arbitrations, White Rock requests immediate injunctive relief in aid of arbitration preserving the status quo by freezing Vesttoo's assets, subject to the ordinary course exceptions contained in the proposed order filed in conjunction herewith.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "**Rules**"), this Court may issue injunctions in aid of foreign arbitration. *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, No. 19 CIV. 3930 (CM), 2019 WL 2240204, at *16 (S.D.N.Y. May 14, 2019), *aff'd*, 789 F. App'x 288 (2d Cir. 2020) (granting injunctive relief in aid of ICC arbitration in Paris, observing that "Federal courts treat motions for preliminary injunctions in aid of arbitration as applications under Rule 65 of the Federal Rules of Civil Procedure and, accordingly, evaluate them under the criteria for Rule 65 motions."); *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994) ("[petitioner] is entitled to an injunction [in aid of foreign arbitration in London] pursuant to Rule 65.")

Section 7502(c) of the New York Civil Practice Law and Rules (the "**CPLR**"), which the Court may invoke pursuant to Rule 64, also provides the authority to issue "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced…upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." New York Federal Courts have consistently granted injunctive relief in aid of foreign arbitration pursuant to this section, too.[21] *Espiritu Santo Holdings, LP*, 2019 WL 2240204, at *16 ("This Court also has authority to issue the requested injunctive relief pursuant to Fed. R. Civ. P. 64, which incorporates state-law provisional remedies, including injunctions in aid

---

[21] White Rock intends imminently to file arbitration proceedings, and certainly "within thirty days of the granting of the provisional relief" as prescribed in CPLR § 7502(c).

of arbitration under C.P.L.R. § 7502(c)."); *Alvenus Shipping Co.*, 876 F. Supp. at 487 ("Rule 64 incorporates state-law provisional remedies. One such remedy under New York law is an injunction in aid of arbitration pursuant to CPLR § 7502(c).  Section 7502(c) permits a court to order an attachment or an injunction in aid of arbitration").

Courts are permitted to issue pre-arbitration injunctive relief in aid of an arbitration process because "[a]rbitration can become a hollow formality if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute.'" *Gen. Mills, Inc. v. Champion Petfoods USA, Inc*., No. 20-CV-181 (KMK), 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020) (citation omitted); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (same).  The standard for injunctive relief in aid of arbitration is "the same as for preliminary injunctions generally" and requires the petitioner to demonstrate: (1) "a likelihood of success on the merits or…sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) irreparable harm; and (3) the balance of equities favors granting the injunction and the public interest is not disserved.  *Benihana, Inc. v. Benihana of Tokyo*, LLC, 784 F.3d 887, 895 (2d Cir. 2015).  CPLR § 7502(c) additionally requires a showing that an arbitration award would be "ineffectual" without provisional relief.  CPLR § 7502(c); *Interoil LNG Holdings, Inc. v. Merrill Lynch PNG LNG Corp.*, 874 N.Y.S.2d 439, 440 (2009).

## I.  <u>White Rock Is Entitled To A Preliminary Injunction Pending Arbitration.</u>

White Rock satisfies the three traditional criteria for the granting of temporary relief: (a) it has a likelihood of success on the merits; (b) there is a danger of irreparable harm in the absence of temporary injunctive relief; and (c) the balance of equities favors granting the relief sought.  Moreover, White Rock has shown that an award to which it may be entitled may be rendered ineffectual without the requested provisional relief, as required under CPLR § 7502(c).

A.      **An Award In Arbitration Would Be Rendered Ineffectual If Vesttoo Conceals Or Dissipates Its Assets.**

White Rock satisfies CPLR § 7502(c)'s requirement that it demonstrate that an arbitration award would be "rendered ineffectual without…provisional relief."  Courts have found that the "ineffectual" prong is met where, absent provisional relief, the relevant assets would dissipate.  *See Moquinon, Ltd. v. Gliklad*, 58 N.Y.S.3d 874 (N.Y. Sup. 2017) (finding that petitioner "has made a *prima facie* showing that an arbitration award would be rendered ineffectual…[because the respondent] intends to dissipate [the] proceeds."); *see also Bridge Assocs. LLC v. Contract Mail Co.*, No. 110639/04, 2004 WL 6031081 (N.Y. Sup. Ct. Nov. 15, 2004) (awarding attachment in aid of arbitration where petitioner demonstrated that respondent's financial future was uncertain and it was at risk of not meeting debt obligations, despite a debt restructuring); *Witham v. VFinance Invs., Inc.*, 851 N.Y.S.2d 75 (Sup. Ct. 2007), *aff'd*, 860 N.Y.S.2d 98 (2008) ("an arbitration award would be rendered ineffectual without provisional relief because Petitioner would lose the right to control his stock and the company").

Here, too, without the requested preliminary relief, any final relief to which White Rock may be entitled in the Bermuda arbitration would be diminished or rendered ineffectual.  Once Vesttoo's assets are concealed or dissipated, it will not be possible to recover them.  Vesttoo is at the center of an apparent global financial fraud scandal, with billions of dollars on the line.  Although Aon has moved expeditiously to investigate Vesttoo's role in forging the LOCs, it is not yet clear who at the company engaged in foul play and what access they may still have to the company's assets.  Vesttoo is also reportedly experiencing concerning internal disarray, with most of its senior leadership resigned or removed and a huge fraud scheme that purportedly caught many Vesttoo employees by surprise.  These facts indicate that Vesttoo's internal compliance and financial viability are seriously lacking, leaving the company unstable.

White Rock's concerns are not abstract.  Vesttoo's financial future and viability in the wake of the LOC fraud are bleak and multiple news reports and industry experts have opined that Vesttoo may be close to total collapse.[22]  The magnitude and sophistication of the financial fraud at issue cast a dark shadow over Vesttoo's stability and weighs strongly in support of provisional relief. Numerous insurance companies and other market actors have already cut ties with Vesttoo, and it has seen an exodus of nearly its entire c-suite leadership.  Moreover, Vesttoo has refused to provide any assurance that it will comply with its obligations under the PSAs, despite the fact that White Rock requested such assurances in writing.  *See* Exhibit 4.  And as noted, Vesttoo's Board of Directors recently decided to remove the company's two top executives, reportedly citing serious accusations.  *See supra* at 9-10.  Under these facts, it is clear that any assets removed from the company now will not be returned or replaced.

### B.    White Rock Will Likely Prevail On The Merits In The Arbitration.

White Rock also has a strong likelihood of prevailing on the merits of its forthcoming arbitration.  To show a likelihood of success on the merits, "a *prima facie* showing of an entitlement to relief is sufficient."  *Witham v. VFinance Invs., Inc.*, 851 N.Y.S.2d 75 (Sup. Ct. 2007), *aff'd*, 860 N.Y.S.2d 98 (2008); *Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp.*, 897 N.Y.S.2d 669 (Sup. Ct.), *aff'd as modified*, 889 N.Y.S.2d 793 (2009) ("the plaintiff must make a *prima facie* showing of entitlement to the relief sought in the underlying action. It is well-settled that plaintiff need not demonstrate certain success in the underlying action").

---

[22]    Steven Scheer, *Fintech Vesttoo to Slash Jobs After Fake Collateral Scandal*, INSURANCE JOURNAL (Aug. 2, 2023) https://www.insurancejournal.com/news/international/2023/08/02/733202.htm; Alan Gallindoss, *Vesttoo Fraud Could Be Worth As Much As $4 Billion,* JEWISH BUSINESS NEWS (July 20, 2023), https://jewishbusinessnews.com/2023/07/20/vesttoo-fraud-could-be-worth-as-much-as-4-billion/; Judy Greenwald and Matthew Lerner, *Vesttoo fallout likely to have lasting effect on market*, BUSINESS INSURANCE, (Aug. 1, 2023) https://www.businessinsurance.com/article/20230801/NEWS06/912358952/Vesttoo-fallout-likely-to-have-lasting-effect-on-market.

Here, it is undisputed that Vesttoo presented White Rock and its clients with fraudulent LOCs, and it is hard to imagine that Vesttoo could argue that the provision of such fraudulent LOCs qualified as "Acceptable Security" under the PSAs. (*See*, *e.g.*, PSA, §§ 4-5, Schedule B) Indeed, Pursuant to Clause 5 and Schedule B of the PSAs, Vesttoo agreed to provide "[White Rock] and/or the [White Rock] Segregated Account with security in a form acceptable to [White Rock], for [Vesttoo's] obligations" which was sufficient to "enable the [White Rock] Segregated Account to meet any and all liabilities and any and all collateral requirements arising pursuant to the terms of the [Reinsurance] Agreement." Moreover, pursuant to Clause 4 of the PSAs, Vesttoo agreed to indemnify White Rock "to the extent the balance of the profits and losses allocated . . . less cumulative dividends paid, are less than zero at any point in time as calculated by [White Rock]." In that event, Vesttoo "agree[d] that it shall pay to [White Rock] the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance." Vesttoo further agreed to "indemnify the Segregated Account in the event the assets of the Segregated Account are insufficient to meet the obligations of the Segregated Account." (*See* PSA, § 5)

These obligations are straightforward. Vesttoo has no likelihood to persuade the arbitral panel that it complied with the PSAs because it evidently had not, based on its own admission that it presented White Rock and its clients with fraudulent LOCs. White Rock thus has a high likelihood of success in the Bermuda arbitration proceedings.

### C.    White Rock Will Suffer Irreparable Harm Absent Injunctive Relief.

Vesttoo has failed to provide assurances that it will preserve the status quo and maintain its assets pending resolution of the Bermuda arbitration. If the relief requested is not granted by the Court, Vesttoo's assets are at risk of falling into the hands of the same bad actors who orchestrated the LOC fraud. Once Vesttoo's assets are dissipated, it will not be possible to recover

or replace them, since Vesttoo's financial future and viability are highly compromised, and it appears to have suffered an incurable reputational hit.

"[I]rreparable harm is perhaps the single most important prerequisite for a preliminary injunction." *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020) (granting injunction). Courts have found irreparable harm where, as here, "there is a real threat that…funds would be dissipated and irretrievably lost[.]" *Republic of Panama v. Republic Nat. Bank of New York*, 681 F. Supp. 1066, 1070 (S.D.N.Y. 1988) (finding that "[t]he existence of such a threat also constitutes irreparable harm sufficient to support a motion for a preliminary injunction"); *New York Land Co. v. Republic of Philippines*, 634 F. Supp. 279, 288 (S.D.N.Y.), *aff'd sub nom. Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) (finding irreparable harm where, "[i]f the restraints are dissolved, the Properties could pass quickly out of the plaintiff's reach…[or] be sold with the proceeds delivered out of the country and beyond plaintiff's reach."); *see also Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 86 (2d Cir. 1996) (the dissipation or transfer of assets in order to frustrate a judgment constitutes irreparable harm).

The fact that White Rock will seek monetary compensation from Vesttoo (in addition to equitable relief)[23] does not make its harm reparable in this case.  Courts have consistently held that a "preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." *Pashaian*, 88 F.3d at 86 (cleaned up).  *See also In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the

---

[23]   White Rock intends to seek rescission of the PSAs as money damages would not provide a complete remedy. Vesttoo fraudulently induced White Rock to enter into the PSAs by making material misrepresentations regarding the validity of LOCs and made these misrepresentations with the intent to deceive White Rock.

defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction.") (cleaned up); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 248 (S.D.N.Y. 2001) ("Preliminary injunctions are…appropriate to thwart a defendant from making a judgment uncollectible").  Courts will award injunctive relief when the defendant lacks or will soon lack the means to pay a judgment in the plaintiff's favor. *Sea Carriers Corp. v. Empire Programs, Inc*. 2006 WL 3354139, at *4 (S.D.N.Y. 2006) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents.") (internal citations omitted).

The above features of irreparable harm are all the more present where, as here, the respondent controlling the assets has already engaged in apparent fraud, rending it susceptible to yet more fraud.  *See Mishkin v. Kenney & Branisel, Inc.*, 609 F. Supp. 1254, 1256 (S.D.N.Y.), *aff'd sub nom. Mishkin v. Branisel*, 779 F.2d 35 (2d Cir. 1985), *and aff'd sub nom. Mishkin v. Kenney Branisel Inc.*, 779 F.2d 35 (2d Cir. 1985) (granting injunctive relief under Rule 65, reasoning that "[respondents'] past fraudulent conduct and their current actions indicate an intent to defeat and defraud…and to impede…[the] efforts to enforce any judgment… The defendants' course of conduct, if not restrained, threatens to denude [the company] of its rapidly diminishing assets").

In sum, absent injunctive relief from this Court, White Rock stands to forever lose its ability to recover from Vesttoo.  No legal remedy could repair White Rock's (and its insurer clients') harm.  *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (injunction freezing assets pending an action alleging fraud upheld where allegations indicate defendant in danger of dissipating assets, and legal remedy would be inadequate).

**D.      The Public Interest and Balance Of Equities Favor Granting An Injunction.**

Enforcement of the parties' lawful agreement also serves the public interest.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015) ("to the extent it is implicated, the public interest here is served by the enforcement of the parties' lawful agreement").  "In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (citation omitted), *See also NML Capital, Ltd. v. Republic of Argentina*, 2012 WL 5895784, at *2 (S.D.N.Y. Nov. 21, 2012) ("The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order.").  The injunctive relief sought herein would do just that—ensure that the PSAs can be effectively enforced against Vesttoo.  The public further "has an interest in the enforcement of contractual obligations and prevention of fraud." *Jet Experts, LLC v. Asian Pac. Aviation Ltd.*, 602 F. Supp. 3d 636, 645 (S.D.N.Y. 2022).  Here, Vesttoo has apparently engaged in lucrative fraudulent activity.  Absent injunctive relief, Vesttoo would reap the economic benefits of its fraud by removing valuable assets from White Rock's reach and thwarting its contractual obligations.  Such a result would not be in the public interest.  (*Id.*)

The balance of equities, too, leans heavily in favor of White Rock.  Vesttoo has refused to assure White Rock that it will comply with the terms of the PSAs.  Rather, in its response to White Rock's demand, Vesttoo ignored White Rock's concerns and brushed them off with general assertions not responsive to White Rock's letter.  (*See* Exhibit 5)  Nor did it provide any legal authority to counter White Rock's assertions or deny that is has breached the PSAs.  (*Id.*)  Vesttoo therefore invited this action by refusing to provide assurances that it will respect its contractual obligations.  *See Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 403 (S.D.N.Y. 2000) (defendant "cannot complain of hardship resulting from a situation which it is largely responsible for

creating.")  White Rock, in contrast, has demonstrated that will be severely impaired absent an injunction, as it stands to permanently lose its ability recover from Vesttoo in the Bermuda arbitration.

## II.     The Court Has Authority To Freeze Vesttoo's Assets.

It is well settled that a "preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible." *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d at 87 (collecting cases). *See also Republic of Philippines v. Marcos*, 806 F.2d at 356 (2d Cir. 1986) (affirming injunctive relief freezing assets that was "intended to prevent any transfer or encumbrance of the properties that would place them beyond [the petitioner's] reach").

It is similarly well-settled that the Court has authority to freeze assets in a Rule 65 injunction where, as here, the remedies sought by the petitioner include equitable remedies, and especially where the underlying action stems from fraudulent conduct.  *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (reiterating that courts have the power to grant a Rule 65 asset freeze injunction where the petitioner seeks equitable relief, among other forms of relief); *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95 CIV. 9341 (RWS), 1997 WL 223077, at *4 (S.D.N.Y. May 1, 1997), *as amended* (May 7, 1997), *aff'd sub nom. Mason Tenders Dist. Council Pension Fund v. Pervale Contracting Inc.*, 131 F.3d 131 (2d Cir. 1997) ("Both the United States Supreme Court and the Second Circuit have made Rule 65 available to secure assets for the ultimate judgment... Almost all the Circuit Court[s] have held that Rule 65 is available to freeze assets *pendente lite*[.]"); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 CIV. 3489 JMF, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) (observing that "as many courts have held, where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets.") (citation omitted).

Here, injunctive relief freezing Vesttoo's assets is warranted because there is significant risk that Vesttoo, or others purporting to act on its behalf, would further their fraudulent scheme by taking actions to dissipate or conceal Vesttoo's assets in order to keep them out of White Rock's reach.  Vesttoo admitted in its July 28, 2023 letter to White Rock that "there is still much that is unknown" to it.  (*See* Exhibit 5)  Furthermore, based on numerous media reports, Vesttoo is facing massive internal compliance and control problems.[24]  Given Vesttoo's current internal disarray, it should not be permitted to move its assets while the Bermuda arbitration is pending.

Moreover, an injunction freezing Vesttoo's assets would comport with the relief White Rock will be seeking in the Bermuda arbitrations.  By its breach, Vesttoo effectively deprived White Rock of its Acceptable Security under the PSAs, which was carefully negotiated between White Rock's insurer clients and Vesttoo.  The benefit of White Rock's bargain under the PSAs was thus fraudulently conveyed to another—be it Vesttoo or a third party.  Under such circumstances, the Court "has the authority to enter a preliminary injunction freezing those assets [White Rock] alleges were fraudulently conveyed."  *Paradigm BioDevices, Inc.*, 2013 WL 1915330, at *3.  In the Bermuda arbitrations, White Rock will be seeking the Acceptable Security that was lacking as a result of fraud, in addition to other remedies it is entitled to under the PSAs.

### III.   An Immediate Temporary Restraining Order Is Warranted.

White Rock also requests a temporary restraining order in addition to preliminary injunctive relief because Vesttoo is in the midst of a severe internal crisis and is entangled in fraud.

---

[24]   Steven Scheer, *Fintech Vesttoo to Slash Jobs After Fake Collateral Scandal*, INSURANCE JOURNAL (Aug. 2, 2023) https://www.insurancejournal.com/news/international/2023/08/02/733202.htm; Gallindoss, Alan, *Vesttoo Fraud Could Be Worth As Much As $4 Billion,* JEWISH BUSINESS NEWS (July 20, 2023), https://jewishbusinessnews.com/2023/07/20/vesttoo-fraud-could-be-worth-as-much-as-4-billion/; Judy Greenwald and Matthew Lerner, *Vesttoo fallout likely to have lasting effect on market*, BUSINESS INSURANCE, (Aug. 1, 2023) https://www.businessinsurance.com/article/20230801/NEWS06/912358952/Vesttoo-fallout-likely-to-have-lasting-effect-on-market.

"The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical."  *Google LLC v. Starovikov*, No. 1:21-CV-10260-DLC, 2021 WL 6754263, at \*2 (S.D.N.Y. Dec. 16, 2021).  "A temporary restraining order pursuant to Fed.R.Civ.P. Rule 65(b) is designed to preserve the status quo."  *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002). Indeed, the purpose of a temporary restraining order is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing[.]"  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

Vesttoo may be at the brink of irreparably harming White Rock by dissipating or concealing its assets.  Maintaining the status quo pending a decision on White Rock's request for a preliminary injunction is therefore crucial.

For the same reasons set forth above, White Rock has demonstrated under each prong of the applicable legal standards the pressing need for a temporary restraining order maintaining the status quo pending decision on a preliminary injunction.

## IV. No Bond Should Be Required Or Any Security Should Be *De Minimis.*

Rule 65(c) requires the recipient of a preliminary injunction or temporary restraining order to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  It is "well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm.'"  *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010) (citing *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).  Courts often decline to require any security at all where there would be no harm to the enjoined party.  *See, e.g., Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("because, under Fed.R.Civ.P. 65, the amount of any

21

bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court…, the district court may dispense with the filing of a bond."); *DeWitt Stern Grp., Inc. v. Eisenberg*, No. 13 CIV. 3060 RWS, 2013 WL 2420835, at *6 (S.D.N.Y. June 4, 2013) ("[petitioner] has failed to establish that he is likely to suffer any harm absent the posting of a bond and as such the bond requirement is unnecessary").

Here, an injunction will not harm Vesttoo. White Rock is not asking this Court to take any assets away from Vesttoo or modify the status quo. To the contrary—the sought injunctive relief is intended to maintain the status quo, in which Vesttoo's assets are held by Vesttoo. Given Vesttoo's current state of affairs, an injunction preventing asset disposition until the dust settles will be in its best interest.

Accordingly, no bond should be required, or any bond should be *de minimis*.

## V.    White Rock Is Entitled To Expedited Discovery And An Order To Preserve Evidence.

White Rock requests that it be permitted to take narrowly tailored expedited discovery, primarily that Vesttoo respond to White Rock's document requests within 7 days of service, and commanding identified deponents to appear for deposition in the offices of White Rock's counsel, at a date to be noticed by White Rock's counsel 5 days prior to the deposition. "Expedited discovery is often available in cases where preliminary relief is sought." *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd*., 1994 WL 719696 at *3 (S.D.N.Y. Dec. 28, 1994), *disfavored on other grounds*, *see also* Fed. R. Civ. P 26(d) and Notes of Advisory Committee on Rules (indicating that early discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction"). When determining whether to grant expedited discovery, courts in this District apply a "flexible standard of reasonableness and good cause." *SingularDTV GmbH v. LeBeau*, 2022 WL 1082557, at *1 (S.D.N.Y. Apr. 6, 2022). Four factors govern this

inquiry: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." (*Id.*)  In evaluating a party's request for expedited discovery, courts analyze "the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (emphasis in original).  This is a "flexible standard of reasonableness and good cause." (*Id.*)

Here, White Rock meets the four factors governing expedited discovery: (1) White Rock could suffer irreparable injury without expedited discovery as Vesttoo, a company in crisis, can dissipate funds from bank accounts which White Rock does yet know exist.  Only through discovery can White Rock identify Vesttoo's accounts and prevent it from committing further fraud and irreparable harm; (2) White Rock is likely to succeed on the merits of its anticipated arbitrations because it is undisputed that Vesttoo presented White Rock and its clients with fraudulent LOCs, and it is hard to imagine that Vesttoo could argue that the provision of such fraudulent LOCs qualified as "Acceptable Security" under the PSAs; (3) Expedited discovery is necessary to avoid irreparable injury to White Rock because it will help identify Vesttoo's assets and key players in Vesttoo's fraudulent scheme which will aid in preventing Vesttoo from dissipating funds prior to an arbitration award.  Time is of the essence particularly as Vesttoo continues to unravel as a company, laying off employees and closing offices; (4) Vesttoo and the financial institutions will not be injured by expedited discovery because the information sought is readily available and scope limited.

Here, White Rock seeks leave to serve discovery on Vesttoo requiring it to produce certain financial records and information, and subpoenas to financial institutions requiring them to disclose whether they are holding Vesttoo's assets.[25]   This expedited discovery is crucial in identifying exactly where Vesttoo's assets are held to ensure they are properly frozen before Vesttoo has the opportunity to dissipate funds.   White Rock seeks document discovery and depositions from the banks in which Vesttoo holds its assets (i.e. Truist Bank).   White Rock further seeks discovery of top Vesttoo employees and former employees based in the United States in order to identify the scope and source of fraudulent activity and the location of Vesttoo's United States based assets including, Gaurav Wadhwa, Lauren Smith, Daniel Goldfried, David Schonbrun, Oran Barkai, Minas Kalachian, Ron Adiel, Nick Graham, and Joseph Haviv.   As previously noted, Vesttoo has recently laid off 75% of its work force including its founders and top executives.   Expedited discovery is necessary to account for the potential departure of recently terminated Vesttoo employees from the U.S. and to secure employee's knowledge which does not last forever.

White Rock would be irreparably harmed if Vesttoo were allowed to remove its assets from U.S. bank accounts to further its fraudulent scheme.   Expedited discovery is necessary to help prevent that harm by revealing further details regarding the bank accounts and potentially other assets of Vesttoo.   At this early stage, it is unclear who at Vesttoo was responsible for the fraudulent LOCs, to what extent Vesttoo was working with financial institutions to effectuate this fraud, Vesttoo's financial status, and the location, nature, and extent of Vesttoo's assets.   The limited discovery White Rock seeks will not impose an undue burden in the U.S. banks, because the

---

[25]   White Rock is entitled to immediately seek discovery pursuant to Fed. R. Civ. P 26(d). By this application, White Rock seeks to shorten the normal response time for discovery.

information sought is readily available and the scope of discovery is limited to the location of Vesttoo's assets and its fraudulent activity.

As to Vesttoo, given its current crisis, information may be more difficult to get with the passage of time, particularly given the ongoing departure of key employees.  There is good cause to permit expedited discovery here in order to develop additional evidence regarding the Vesttoo's fraudulent conduct and to ensure that any funds and assets are frozen properly and available to satisfy any future arbitral award.  Expedited discovery also will likely uncover further details regarding Vesttoo's plan to secure fraudulent letters of credit and will likely allow Petitioner to determine whether Vesttoo was working with financial institutions.  Only with knowledge of Vesttoo's actions and intentions can Petitioner and this Court make the measures necessary to prevent the harm which Vesttoo seeks to cause.

The proposed TRO requires Vesttoo to produce certain financial records and information, and requires financial institutions served with the order to disclose whether they are holding Vesttoo's assets.  In addition, Petitioner requests an order requiring Vesttoo to preserve all potentially relevant evidence to ensure Vesttoo abides by its obligations to preserve evidence that may be related to this action, and to ensure that such evidence is not destroyed, altered, concealed, or otherwise compromised.  Petitioner requests that Vesttoo preserve any computer disks or hard drives in its possession, so that Petitioner may be permitted to image and copy the contents of these disks and hard drives to determine to what extent Vesttoo effectuated this fraud.  Petitioner also requests that Vesttoo preserve the content of any e-mail account in its control, so that Petitioner may be permitted to review Vesttoo's e-mail to determine Vesttoo's role in fraud, whether it was working with any third parties, and the extent and location of its assets.

Prohibiting the destruction of documents is necessary because of the possibility that the Vesttoo will destroy evidence of their ongoing fraud.  Vesttoo is moving quickly further warranting expedited discovery.  Just this month it announced a plan to close nearly half its offices, laid off of 75% of its workforce, and put two of its three co-founders, who were also in its Board of Directors, on leave.  As time passes, it would become more difficult to restore any deleted evidence.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests an order pending resolution of the forthcoming arbitration proceedings awarding the following relief:

1.     Injunctive relief in aid of the forthcoming arbitrations enjoining Vesttoo from transferring, withdrawing, assigning, alienating, selling, pledging, encumbering, concealing, hypothecating, or disposing any of its assets, including funds in Vesttoo's bank accounts, held in bank accounts with Truist Bank, except for funds in the amount of $1,000,000, necessary to pay Vesttoo's employees, taxes, and existing subcontractors and suppliers essential to Vesttoo's ordinary course operations;

2.     Leave to immediately commence document discovery and deposition discovery, commanding Vesttoo to respond to White Rock's document requests within 7 days of service, and commanding Truist Bank, Gaurav Wadhwa, Lauren Smith, Daniel Goldfried, David Schonbrun, Oran Barkai, Minas Kalachian, Ron Adiel, Nick Graham, and Joseph Haviv to appear for deposition in the offices of White Rock's counsel, at a date to be noticed by White Rock's counsel 5 days prior to the deposition;

3.     Attorney's fees and costs in relation to the instant proceeding; and

4.     Any other monetary, injunctive, or other relief that, in the interest of justice, the Court deems necessary and proper.

DATED:   New York, New York       **QUINN EMANUEL URQUHART &**
             August 10, 2023               **SULLIVAN, LLP**

By: _____

Renita Sharma
Michael B. Carlinsky
Katherine A. Lemire
Jonathan Feder
Yehuda Goor
Jacqueline Stykes
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Petitioner White Rock Insurance
(SAC) Ltd.*

27